UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

CARLA AUSBROOKS,

                Plaintiff,            Civil Action No. 12-12144
                                            Magistrate Judge David R. Grand

        v.

MICHAEL ASTRUE,
Commissioner of Social Security,

                Defendant.
_____/

**OPINION AND ORDER ON CROSS-MOTIONS
FOR SUMMARY JUDGMENT [10, 20] AND
PLAINTIFF'S MOTION FOR SENTENCE-SIX REMAND [11]**

Plaintiff Carla Ausbrooks ("Ausbrooks") brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [10, 20]; Ausbrooks has also filed a motion to remand under sentence six of 42 U.S.C. § 405(g) [11]. The parties have consented to have this matter resolved by an order of this Court, pursuant to 28 U.S.C. § 636(c). [16].

I.       **BACKGROUND**

      A.      **Procedural History**

On June 12, 2009, Ausbrooks filed an application for DIB, alleging disability as of October 5, 2008. (Tr. 128-34). The claim was denied initially on October 1, 2009. (Tr. 88-91). Thereafter, Ausbrooks filed a timely request for an administrative hearing, which was held on December 3, 2010, before ALJ Melissa Warner. (Tr. 31-86). Ausbrooks, represented by

attorney Thomas Bertino, testified, as did vocational expert ("VE") Pauline Pegram. (*Id.*). On January 14, 2011, the ALJ found Ausbrooks not disabled. (Tr. 13-30). On April 3, 2012, the Appeals Council denied review. (Tr. 1-5). Ausbrooks filed for judicial review of the final decision on May 14, 2012. [1]. On May 2, 2013, this Court entered a stipulation and order amending Ausbrooks's complaint to reflect the parties' agreement that her "request for relief, including reversal or remand, pertains only to the period October 5, 2008 to January 14, 2011, and that in the case of remand, consideration shall be limited to same." [25].

### B.    Factual History

#### 1.    Disability Reports

In disability and work activity reports prepared in June 2009, Ausbrooks indicated that the following conditions limit her ability to work:  "[b]ipolar, manic, depressive and chronic back and [left] knee pain." (Tr. 165-83) Ausbrooks reported that these conditions limit her ability to work because she has "trouble concentrating" and "terrible insomnia," "was unable to take my medication and perform my job duties," had "mood swings" and was argumentative, "prefer[s] to be alone" and does not "like to go out in public," and is "unable to sit, stand or walk for any prolonged period." (Tr. 176).  She reported that these conditions first interfered with her ability to work in 1990, and rendered her unable to work on October 5, 2008. (*Id.*).  From October 21, 1994, until that date, Ausbrooks reported that she worked on the assembly of vehicles for an automotive manufacturer, Chrysler; thereafter, she was employed as a direct care worker from November 10, 2008, until January 1, 2009, and as a pool monitor in June of 2009. (Tr. 166, 177-78, 200-07).  Ausbrooks reported that she had received treatment from a number of sources for her physical and mental conditions, and was being treated with medication. (Tr. 178-81; *also* 184-91 (October 2009 report), 227-228 (January 15, 2010 report)).

2

According to function reports prepared by Ausbrooks and her sister in June 2009, Ausbrooks does light housework (e.g., unloading the dishwasher, sweeping, dusting, and making her bed), but cannot do yardwork; cooks simple meals; handles her own personal care, but has some difficulty dressing, bathing, and combing her hair and sometimes needs to be prompted to perform such tasks; drives and rides in a car; goes outside two or three times a week, and makes quick shopping trips for groceries and essentials two to three times a week; used to enjoy reading and crocheting, but is no longer able to concentrate well enough to do them; has difficulty managing her finances; does not handle stress or changes in routine well; is antisocial and paranoid; and has difficulty sleeping, following instructions, remembering and concentrating, and getting along with others (including authority figures).  (Tr. 192-99, 208-15).  Ausbrooks reported that she can walk for a quarter of a mile before needing to stop and rest for ten minutes, and that she cannot squat, bend, stand or sit for too long, climb stairs, or lift more than fifteen pounds.  (Tr. 213, 215).

## 2.    *Plaintiff's Testimony*

At the hearing held on December 3, 2010, Ausbrooks testified that she is 47 years old, married, and lives with her husband (who attended the hearing), daughter, son, and granddaughter.  (Tr. 38-39).  She is able to read, write and do basic math.  (Tr. 40).  Ausbrooks testified that her work at Chrysler ended in October 2008.[1]  (Tr. 42).  She then worked in a group home four days a week, eight hours a day, from November 2008 to January 2009, but "wasn't able to do that work" due to its physical demands—lifting residents "up and down, and to the bathrooms and to the showers"—and also because she "had to pass medication and . . . couldn't

---

[1] The ALJ indicated in her decision that Ausbrooks "took a buyout" (Tr. 24), and the Court notes that at the hearing Ausbrooks indicated that she did not apply for unemployment or workers' compensation benefits after she "quit working for Chrysler."  (Tr. 42).

3

concentrate to pass the medication correctly." (Tr. 41-42, 64). The last time she worked was in June 2009, for about six days as a pool monitor; she worked nine-hour days but ultimately had to stop because she "couldn't do the work," namely "raise the umbrellas." (Tr. 40-41).

Ausbrooks testified that she has suffered from numerous physical impairments, including arthritis in her knees, problems with her lower back and right shoulder, diabetes, restless leg syndrome, sleep apnea, and incontinence. (Tr. 42-45). As to her diabetes, she testified that it "shows up in [her] blood work" when her weight fluctuates above 200 pounds, but was not present at her current weight of 185 pounds; when she was working for Chrysler, she found it "impossible . . . to carry the proper diet and . . . because of my scheduling, to take care of [the diabetes] period." (Tr. 38, 42-43). She testified that she has been having difficulty sleeping due to sleep apnea for "[a] long period of time" and was prescribed a CPAP machine in 2006 but never got it because "I'm overwhelmed with the medication and the things that I already take." (Tr. 43-44, 53). She testified that she experienced problems with her right shoulder while working at Chrysler and that "[i]t's sore now." (Tr. 44). She testified that she had a bladder suspension surgery in 2009, but it was only beneficial for approximately three months, and now "I can't cough or sneeze or I have to get to the bathroom quick"; she has to go to the bathroom ten to fifteen times during the day and two to three times at night, and sometimes she has to stay in the bathroom for "a while." (Tr. 45, 63). Lastly, she testified that surgery has been recommended for her knees, but she "ha[s]n't seen a reason to have it done." (Tr. 53).

As to mental impairments, Ausbrooks testified that she suffers from bipolar disorder and depression, for which she started receiving counseling and medication in 1992. (Tr. 45). She testified that, as a result of her depression, she "sometimes" "just do[es]n't function," stays in her house, has "a hopeless feeling" and "do[es]n't want to live." (Tr. 45). She also testified to

4

having panic attacks three or four times a month.  (Tr. 64-65).

As to treatment, Ausbrooks testified that she sees Dr. Linares, a pain management specialist, once a month for tests and medication; Dr. Polavarapu, a psychiatrist, every two months and a therapist "[t]wice a month, sometimes more"; and Dr. March, her primary care physician, roughly twice a year.  (Tr. 49-50).  She takes "a very high dose" of Seroquel every day for her depression, which has been "quite beneficial" for her but "doesn't always work." (Tr. 45-47).  She also takes meloxicam for her arthritis, Ambien at night for sleep, Vicodin, and has had three sets of cortisone injections in her lower back, but reported experiencing breakthrough pain.  (Tr. 47-48).  Her husband manages her medications, and she identified dry mouth, constipation, confusion, memory loss, personality disorder, and sleepiness as side effects of these medications.  (Tr. 50, 62).  She testified that, when she was working, she could not take her medications due to these side effects, and had a "bad accident in 2005 from [her] medication."  (Tr. 62-63).  She also testified that she used marijuana for a period of time to help with her sleep and anxiety, but no longer does so.  (Tr. 50-51).

Ausbrooks testified that, as a result of these impairments, she can walk, stand, and sit for only ten minutes each, and is "constantly"[2] changing her position to relieve pain.  (Tr. 51-52, 56).  Approximately six to eight times a day for thirty to forty-five minutes at a time, she lies down or sits with her legs elevated at waist height, which helps stretch and relieve pain in her spine, legs, and feet.  (Tr. 52, 58, 60-61).  She can lift a gallon of milk, but cannot carry it.  (Tr. 56).  She has difficulty touching her toes and knees, and cannot climb stairs; due to her arthritis, she cannot drive, brush her hair, or do anything repetitive without her hands hurting.  (Tr. 56-57).

---

[2] When Ausbrooks gave this testimony, the ALJ noted that "we've been sitting here for 20 [minutes]," to which Ausbrooks responded, "I have to sit here for this hearing, don't I []?"  (Tr. 52).

5

Ausbrooks testified that, during a typical day, she watches television, looks at magazines, and listens to music, but is unable to concentrate well enough to read.  (Tr. 54-55).  She plays with her granddaughter by singing with her, reading to her, and watching her dance, and she helps her 14-year-old son with his homework.  (Tr. 39, 55-56).  She is able to tend to her personal needs, such as showering, dressing, and feeding herself, but does not do household chores other than some cooking and "[r]un[ning] a cloth across a table."  (Tr. 53-54, 56).  She drives approximately once a week for ten to twenty minutes, and goes to church twice a month, sitting in the back or in a rocking chair in the baby's lounge due to her aversion to crowds.  (Tr. 39-40, 56, 58).  Ausbrooks testified that she stays in her room without leaving for two to three days per week to avoid "deal[ing] with anything in the household or in my head," and has gone for weeks and months at a time without leaving the house except for doctors' appointments.  (Tr. 60).

### 3.  *Medical Evidence*

#### a.  *Treating Sources*

##### i.  *Mercy Memorial Hospital; Dr. Ravi Polavarapu*

Ausbrooks has received a substantial amount of treatment for her physical and mental conditions at Mercy Memorial Hospital.  (Tr. 247-317, 408-667, 704-61).  As to her physical impairments, the record contains notes and documentation from numerous emergency room visits and follow-up appointments between 2004 and 2009 reflecting a variety of ailments, including back, chest, and abdominal pain, sprains in her knee and ankle, bronchitis, pleurisy, E. coli, pyelonephritis, hypokalemia, diabetes, hypercholesterolemia, hypothyroidism, acute inflammatory colitis, second-degree cystocele and rectocele, and urinary stress incontinence; the only such visits that occurred during the relevant time period pertained to her issues with incontinence and consequent bladder suspension surgery in May of 2009.  (Tr. 262-76, 315-17,

408-16, 419-550).  Aside from this surgery, Ausbrooks's various physical ailments were treated with medication.  (*Id.*)

As to her mental impairments, the record indicates that Ausbrooks began receiving treatment at The Family Center of Mercy Memorial Hospital in 2002, and aside from four admissions (May 2004, January 2005, February 2007, and June 2007), she was treated on an outpatient basis.  (Tr. 247-61, 277-314, 417-18, 551-667).  During the relevant time period, she was under the care of psychiatrist Ravi Polavarapu, M.D., whom she saw on a quarterly basis; she also saw therapists at The Family Center on a more frequent basis, as needed.  (Tr. 584-87, 624-33, 653-63).  These treatment notes reflect Ausbrooks's struggles with depression and bipolar disorder, and indicate that these conditions were treated with counseling and medication. (*Id.*).  In particular, the notes indicate that Ausbrooks benefits significantly from Seroquel and that, when following this course of treatment, her conditions are well controlled.  (*See, e.g.*, Tr. 660 (July 2009 note that Ausbrooks's "[m]ood is very well stabilized on the Seroquel and her affect is bright"); 587 (August 2009 note that Ausbrooks "was able to restart [Seroquel with] excellent symptom remission!"); 661 (August 2009 note that her "mood is improved using the coupon for" Seroquel and she is "doing well in all areas")).  Notes from the end of 2008 through May of 2009 assess Ausbrooks with a GAF score of 65-70, and notes from September 2009 through August 2010 reflect periodic difficulty with depression and mood swings, but also partial to full remission of her bipolar disorder.  (Tr. 584-86, 630-33).

On August 27, 2010, Dr. Polavarapu completed a Psychiatric Evaluation Form for Affective Disorders regarding Ausbrooks.  (Tr. 697-703).  Dr. Polavarapu diagnosed Ausbrooks with Bipolar I Disorder.  (Tr. 698).  He indicated that she has experienced a number of symptoms related to depressive and manic syndromes—namely, anhedonia, sleep disturbance, psychomotor

agitation or retardation, decreased energy, feelings of guilt and/or worthlessness, difficulty concentrating or thinking, thoughts of suicide, hyperactivity, pressure of speech, flight of ideas, decreased need for sleep, easy distractibility, involvement in activities with a high probability of painful consequences which are not recognized, and paranoid thinking—and that she has demonstrated bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes. (Tr. 699). As to impairments in daily activities, he indicated that she has marked or extreme difficulties cooking, using the telephone, paying bills, planning daily activities, and initiating and participating in activities independent of supervision and direction, and noted that these difficulties "have occurred during periods of [her] mood cycling." (Tr. 700). As to impairments in social functioning, he indicated that she intermittently has marked or extreme limitations communicating clearly and effectively; getting along with family, friends, neighbors, and strangers; showing consideration for and cooperating with others (including co-workers); initiating social contact; exhibiting social maturity; responding to supervision and to those in authority; establishing interpersonal relationships; holding a job; and avoiding altercations. (Tr. 700-01). As to impairments in concentration, persistence, and pace, he indicated that she had marked or extreme difficulties with concentration, assuming increased mental demands associated with competitive work, and sustaining tasks without an unreasonable number of breaks or rest periods. (Tr. 701). He indicated that, in stressful circumstances, she has displayed an inability to appropriately accept supervision, cope with schedules, and adapt to changing demands; poor decision making and attendance; withdrawal from situations; inappropriate interaction with peers; and exacerbation of signs and symptoms of illness. (Tr. 701-02). He noted that, while at Chrysler, Ausbrooks was unable to perform her job safely and was put on medical leave during periods of depression and

symptom exacerbation, and has experienced "repeated periods of decompensation that have necessitated inpatient psychiatric hospitalization." (Tr. 698, 700, 702-03). He answered "yes" to whether Ausbrooks has a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support; he then noted that Ausbrooks "has been treated," and did not answer the subsequent questions called for by his "yes" response. (Tr. 702-03). He noted that Ausbrooks's mental condition was a "lifelong illness" and that she has experienced "no major side effects" to her medication, but that previous medications were changed and discontinued due to negative side effects. (Tr. 703).

### ii.     Monroe Medical Associates

Ausbrooks began receiving primary care from Tedd March, M.D., and Monroe Medical Associates in August of 2007; the record contains treatment notes from that visit, eight visits in 2008, and two visits in 2010, as well as results from tests performed in connection with those visits. (Tr. 318-52, 668-85). These visits addressed a variety of ailments, including Ausbooks's complaints of physical pain (particularly in her lower back and chest), anxiety, and difficulty sleeping; the notes reflect treatment with medication. (*Id.*). In June of 2008, while Ausbrooks was still employed with Chrysler, Dr. March indicated that she was unable to work from June 11 through July 7, 2008, due to chest pain and anxiety. (Tr. 335-36, 344-46, 350-52).

### iii.     Dr. Oscar Linares

Ausbrooks began seeing Oscar Linares, M.D., for pain management on May 12, 2009; the record contains treatment notes from that visit and from visits on May 29, 2009, June 15, 2009, June 21, 2010, and July 21, 2010. (Tr. 354-59, 362, 686-89). In these notes, Dr. Linares indicated that Ausbrooks suffered from lumbar spondylosis, lumbar radiculopathy, back pain,

pain in her knees, and bipolar disorder, and that her conditions were being treated with medication, which was "controlling [the] pain." (*Id.*). Ausbrooks rated her pain at various points between 5/10 and 10/10 throughout these visits, and during some visits also provided an assessment of the limiting effects of her conditions. Namely, during her visits on May 29 and June 15, 2009, Ausbrooks reported that she could not squat; could engage in recreational activities with great difficulty or not at all; could reach and do housework and yardwork with great difficulty; could sit, go up and down stairs, change her position, drive or ride in a vehicle, lie down, lift and carry more than ten pounds, and perform daily job activities with some to great difficulty; could walk, grip, flex and extend her arm and elbow with some difficulty; could stand and get dressed with some to no difficulty; and could tend to her hygiene, eat, swallow, and move her mouth and jaw with no difficulty. (Tr. 356, 359).

On the referral of Dr. Linares, a bone scan was performed on Ausbrooks on May 15, 2009, revealing significant increased uptake of tracer in the right kidney, suggesting pyelocaliectasis; in both knees, prominently in the patellas; and in the bifrontal regions of the skull. (Tr. 353). Other than these arthritic changes and the right kidney pyelocaliectasis, the test was negative, and revealed no evidence of bony metastases. (*Id.*). Also on the referral of Dr. Linares, a sensory conduction study was performed on Ausbrooks on July 21, 2010. (Tr. 690-91). The report offered a presumptive diagnosis of "[l]umbosacral plexopathy without motor deficit," and noted mild to moderate (1 to 2 out of 5) findings suggesting pathology in her sapheous nerves, peroneal nerves, and right femoral cutaneous nerve, but no findings suggesting irritation. (Tr. 690). Dr. Linares's records also contain an echocardiogram test administered May 13, 2009, which was unremarkable, and an ultrasound test administered that same day, which revealed mild bilateral carotid plaque with no significant stenosis. (Tr. 360-61).

10

On August 17, 2010, Dr. Linares completed a Physical Residual Functional Capacity Questionnaire regarding Ausbrooks. (Tr. 692-96). He diagnosed her with pain in both knees, lumber spondylosis, lumbar radiculopathy, and bipolar disorder, and offered a prognosis of "[g]uarded." (Tr. 692). He noted that Ausbrooks complains of pain in the mid to lower back, in both knees, and in both hands, that is "constant" and "increases with activity." (*Id.*). He also noted that Ausbrooks complained of insomnia, depression, and "sometimes anxiety." (*Id.*). He identified the bone scan and the sensory nerve conduction study as "clinical findings and objective signs" in support. (*Id.*). He noted that Ausbrooks experiences nausea, dizziness, constipation, depression, and some anxiety as side effects of her medication. (*Id.*). He indicated that emotional factors contribute to the severity of her symptoms and functional limitations, and that her physical condition is affected by the following psychological conditions: depression, anxiety, somatoform disorder, personality disorder, and other psychological factors. (Tr. 693). He indicated that, during a typical workday, Ausbrooks's pain and other symptoms are severe enough to constantly interfere with the attention and concentration needed to perform even simple work tasks, and that she is incapable of even "low stress" jobs, noting that she complains of "constant pain, anxiety, [and] poor concentration." (*Id.*). Dr. Linares did not answer the question, "Is your patient a malingerer?" (*Id.*).

As a result of her impairments, Dr. Linares indicated that Ausbrooks can walk approximately one block without rest or severe pain, and can sit and stand each for ten minutes at a time. (Tr. 693-94). He indicated that, during an eight-hour workday, she can sit and stand/walk each for less than two hours total; must walk around every ten minutes for five minutes at a time; must be able to shift positions at will from sitting, standing, or walking; must be able to take unscheduled breaks every 15-20 minutes for 10-15 minutes at a time; must have

11

her legs elevated to hip level during prolonged sitting, and in a sedentary job, must maintain this elevation 100% of the time; and can only reach, perform fine manipulations with her fingers, and grasp, twist, and turn objects during 10% of the day each.  (Tr. 694-95).  He noted that, when standing and walking, she does not need to use a cane or other assistive device, but that she "states [that she] needs to hold onto things along the way."  (Tr. 694).  She can lift and carry less than ten pounds rarely, and never any amount more than that; can rarely climb stairs, and never twist, stoop, squat, or climb ladders; and can occasionally look down and up, turn her head right or left, and hold her head in a static position.  (Tr. 695).  He noted that Ausbrooks needs to avoid wetness and humidity, as they cause pain, and needs to avoid noise, as it causes anxiety.  (Tr. 696).  He indicated that her impairments are likely to produce "good days" and "bad days" and will likely result in her being absent from work more than four days per month.  (Tr. 695).

### b.    Consultative and Non-Examining Sources

### i.    Dr. Moises Alviar

On September 19, 2009, internist Moises Alviar, M.D., completed a physical examination of Ausbrooks at the request of the agency.   (Tr. 370-77).  Dr. Alviar reported that Ausbrooks's chief complaints were "[a]thritis of the back and knee and bipolar disorder," and that Ausbrooks stated that she has been treated with medication for her back and knee pain, which is "8/10 at its worst to 4/10 after taking analgesics," and that she "has [a] constant burning sensation in her back" and "has difficulty lifting anything."  (Tr. 370).  He noted that, according to Ausbrooks, "[s]he was advised to have surgery on the left knee but did not have it done because she had no assurance that it would make her better."  (*Id.*).  Dr. Alviar also reported that Ausbrooks mentioned having bipolar disorder, "has been hospitalized in the past for depression with some suicide attempts," and "complains of having problems sleeping all of her life."  (Tr. 370).

12

Dr. Alviar noted, in his review of Ausbrooks's systems, that she has chronic, persistent pain involving the back and knee; no diabetes or thyroid problems; and no memory loss. (Tr. 371). Dr. Alviar observed that Ausbrooks's abdomen was obese; her gait was normal; she could tandem walk very slowly but could not do tiptoe and heel walking due to knee pain; she could bend but could not reach her toes due to her back pain; she could squat but has problems arising; she had decreased range of motion in her back, knees, and left hip; and her straight-leg raising was eighty degrees on the right and sixty degrees on the left with negative indirect. (*Id.*). He also observed decreased handgrip bilaterally (in the left more than the right), but no clubbing or cyanosis, and otherwise intact digital dexterity. (*Id.*).

Dr. Alviar diagnosed Ausbrooks with "[c]hronic lower back pain with intensity of 8/10 at its worst, probably secondary to osteoarthritis of the spine"; "[o]steoarthritis in the knee with positive crepitus and decreased range of motion of the knee joint[, t]he left more than the right"; obesity; and bipolar disorder. (Tr. 372). He opined that,

> [b]ased on today's exam, [Ausbrooks] should be able to work a few hours in an 8 hour workday in either a seated or standing position but on a very limited basis. She has limitations for walking. The range of motion of the upper extremities are satisfactory although the handgrip is decreased on the left, the etiology of which is undetermined at the present time. She should be able to push, pull and carry more than 10 pounds reasonably however there are limitations for climbing stairs, ropes and ladders. Other limiting factors for [Ausbrooks]'s work capability is the bipolar disorder.

(Tr. 371-72).

### ii.    *Dr. Nick Boneff*

Also on September 19, 2009, psychologist Nick Boneff, Ph.D., completed a mental status examination of Ausbrooks at the request of the agency. (Tr. 364-68). Dr. Boneff reported that Ausbrooks "alleges disability secondary to a bipolar disorder with manic episodes, symptoms of insomnia, periods of grandiose thinking, heavy drinking, over spending, followed by depression

and suicidal ideation." (Tr. 364). He noted that, according to Ausbrooks, "she has never actually tried to harm herself but has been hospitalized . . . 4 or 5 times psychiatrically because of severe depression." (*Id.*). He reported that, during her fourteen years with Chrysler, Ausbrooks "had to take short term medical leaves due to her psychiatric problems but maintained her full time work status." (*Id.*). He also noted that Ausbrooks injured her back in 2005 and that she stated that, after her work with Chrysler, she "tried to return to work doing some home health care but could not do the heavy lifting." (*Id.*). As to daily activities, Dr. Boneff reported that Ausbrooks "likes to read," "will drive herself very short distances and can prepare light and simple meals and can dress independently," but "no longer goes out to shop or leave[s] the house to socialize." (Tr. 365). He noted that Ausbrooks stated that "her sleep is disturbed by pain although she sometimes smokes marijuana or takes Seroquel to aid this." (*Id.*).

Dr. Boneff observed that, during the exam, Ausbrooks was polite, cooperative, organized, logical, and mildly anxious; she completed the exam and spoke clearly and articulately throughout. (Tr. 365-66). Dr. Boneff diagnosed Ausbrooks with bipolar disorder based on her history, listed her GAF score as 55, and noted her chronic back pain. (Tr. 366). He listed her prognosis as fair, opining that Ausbrooks "should be able to do simple work related activities within the confines of her pain restrictions" and that "[i]f she continues to be compliant with her current medication and treatment she will do adequately." (*Id.*).

### iii.   Dr. Jerry Csokasey

On October 1, 2009, state agency medical consultant Jerry Csokasey, Ph.D., completed a records-based Psychiatric Review Technique Form (PRTF) and Mental RFC Assessment regarding Ausbrooks. (Tr. 386-407). On the PRTF, Dr. Csokasey indicated that Ausbrooks suffers from the medically determinable impairments of bipolar disorder and alcohol abuse; is

14

mildly restricted in her activities of daily living; has moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace; and has experienced no episodes of decompensation of extended duration.  (Tr. 386-96).  He summarized certain of Ausbrooks's treatment records, Dr. Boneff's findings, and Ausbrooks's statements regarding her conditions, and concluded that her "statements of functional limitation" are "credible but do not result in marked limitations."  (Tr. 398).  He further concluded that Ausbrooks "is able to perform simple/routine tasks on a sustained basis." (*Id.*).

In his Mental RFC Assessment, Dr. Csokasey indicated that Ausbrooks is moderately limited in her ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to interact appropriately with the general public, and to accept instructions and respond appropriately to criticism from supervisors.  (Tr. 400-01).  He otherwise found her to be not significantly limited in her understanding and memory, sustained concentration and persistence, social interaction, and adaption, and reiterated his conclusion that she "is able to perform simple/routine tasks on a sustained basis."  (Tr. 400-02).

### 4. *Vocational Expert's Testimony*

At the hearing before the ALJ, the VE testified regarding a hypothetical individual vocationally situated as is Ausbrooks who can perform all the functions of sedentary work except: the individual needs a sit/stand option every thirty minutes for one to two minutes within the immediate vicinity of the workstation; can occasionally climb stairs; can never climb ladders or crawl; can rarely (*i.e.*, less than occasionally, but not totally precluded) kneel and crouch; can endure occasional exposure to temperature extremes and humidity; and can perform wok at the SVP 1 or 2 level[3] with occasional contact with the general public, co-workers, and supervisors.

---

[3] In the Dictionary of Occupational Titles, "unskilled work corresponds to an SVP of 1-2."

(Tr. 68-69).  The VE testified that such an individual could not perform Ausbrooks's past relevant work, but would be able to perform the requirements of unskilled, sedentary occupations that allow for a sit/stand option such as Bench Hand, Assembler, and Inspector, and that there are 10,000 such jobs in the State of Michigan.  (Tr. 69-71).  The VE testified that unscheduled five-minute bathroom breaks during non-break hours could be accommodated in these jobs; she elaborated that, based on information from union contract negotiations, six minutes per hour for such breaks is reasonable, and the jobs she identified are particularly suited for such an accommodation, as they were not on high-speed production lines where the speed is set external to the employee.  (Tr. 71-72, 76-77).  The VE confirmed that these jobs have production standards, and that they would typically tolerate approximately one absence per month.  (Tr. 75-78).  The VE also confirmed that these jobs require handling and fingering, and could not be performed by an individual who could only use his or her hands for ten percent of an eight-hour workday.  (Tr. 78-80).  Lastly, the VE testified that these jobs could not be performed by an individual who, for at least one third of the day, is markedly to extremely limited in social functioning such that he or she could not interact at all with or respond appropriately to co-workers and supervisors during that time.  (Tr. 81-83).

### C.    Framework for Disability Determinations

Under the Act, DIB is available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

S.S.R. 00–4p.

16

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

**D.     The ALJ's Findings**

Following the five-step sequential analysis, the ALJ found Ausbrooks not disabled under the Act.  The ALJ first found that Ausbrooks met the insured status requirements of the Act through December 31, 2013, and had not engaged in substantial gainful activity since October 5, 2008.  (Tr. 18).  At Step Two of the analysis, the ALJ found that Ausbrooks has the following

17

severe impairments:  bilateral knee osteoarthritis, sleep apnea, bladder dysfunction, lumbar spondylosis and radiculopathy, bipolar disorder, and anxiety disorder.  (Tr. 18-19).  At Step Three, the ALJ found that Ausbrooks's impairments, considered alone or in combination, did not meet or medically equal any of the applicable listed impairments in the regulations.  (Tr. 19-20).

The ALJ then assessed Ausbrooks's residual functional capacity ("RFC"), concluding that, through the date last insured, she was capable of performing sedentary work as defined in 20 C.F.R. § 404.1567(a)[4] except that she: requires the ability to alternate between sitting and standing every thirty minutes for one to two minutes in the immediate vicinity of her work station; can occasionally climb stairs; can rarely (defined as less than occasionally but not totally precluded) kneel, crouch, or crawl; occasionally be exposed to temperature extremes and humidity; is limited to work with an SVP of 1-2 that only requires occasional contact with the general public, coworkers, and supervisors; and should be allowed unscheduled five minute bathroom breaks during non-regular break hours.  (Tr. 20-24)

At Step Four, the ALJ determined that Ausbrooks is unable to perform her past relevant work as an unskilled assembler, which she performed at the medium exertion level, as it exceeds her RFC of less than sedentary work.  (Tr. 25).  At Step Five, the ALJ concluded, based in part on the VE's testimony, that Ausbrooks is capable of performing jobs that exist in significant numbers in the national economy.  (Tr. 25-26).  Accordingly, the ALJ concluded that Ausbrooks is not disabled under the Act.  (Tr. 26).

---

[4] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

E.    **Standard of Review**

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r Soc. Sec. Admin.*, 402 F.3d 591, 595 (6th Cir. 2005) (quotation marks omitted); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quotation marks omitted).  In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health*

19

*& Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations omitted).

**F.      Cross-Motions for Summary Judgment**

In her Motion for Summary Judgment [10], Ausbrooks contends that the ALJ committed numerous reversible errors in determining that she was not disabled during the relevant time period.  As set forth below, this Court disagrees with Ausbrooks's claims of error, and finds that substantial evidence supports the ALJ's determination.

*1.      The ALJ Did Not Err in Her Assessment of the Opinions of Treating Sources Dr. Linares and Dr. Polavarapu*

Ausbrooks claims that the ALJ erred by failing to afford proper weight to the opinions of her treating sources, Dr. Linares and Dr. Polavarapu.  [10 at 14-17, 19-20].  An ALJ must give a treating physician's opinion controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)).  If an ALJ declines to give a treating physician's opinion controlling weight, she must then determine how much weight to give the opinion "by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship,

20

supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see* 20 C.F.R. § 404.1527(c)(2). The ALJ must give good reasons, supported by substantial evidence in the record, for the ultimate weight given to a treating source opinion. *Blakley*, 581 F.3d at 406-07; *see* S.S.R. 96-2p (ALJ's analysis "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight"). An ALJ is not required to give any special weight to a treating source's conclusion that a claimant is disabled, as this conclusion is reserved to the Commissioner alone, based on all the evidence of record. 20 C.F.R. § 404.1527(d)(1), (d)(3). As discussed below, this court sees no error in the ALJ's application of this standard to the opinions of Drs. Linares and Polavarapu.

### a. Dr. Linares

As to Dr. Linares, the ALJ noted that Ausbrooks had been seeing him "for pain management for the past year and a half, although according to medical records, treatment has been very sporadic." (Tr. 22). The ALJ summarized Dr. Linares's treatment notes (*id.*) and his August 17, 2010 Physical RFC Questionnaire. *See supra* at 10-12. (Tr. 23). The ALJ concluded that Dr. Linares's opinion was entitled to "very little weight" because: "it is inconsistent with [his] own treatment notes"; "there is no medical evidence that supports the hand limitations or the need for [Ausbrooks]'s legs to be elevated 100% of the day"; and "the limitations opined by [him] are not supported by any other medical sources and are inconsistent with the medical record as a whole." (*Id.*).

This analysis satisfies the requirements of the treating physician rule: the ALJ declined

to give Dr. Linares's opinion controlling weight because it was not well supported by medically acceptable clinical and laboratory diagnostic techniques and was inconsistent with substantial evidence in the record; she made clear what weight the opinion deserved; and she gave good reasons for that assessment.  Ausbrooks takes issue with every aspect of this assessment [10 at 14-17], but the Court finds it is supported by substantial evidence.

First, the Court agrees with the ALJ that Dr. Linares's opinion regarding Ausbrooks's functional limitations does not comport with the medical record.  The only objective evidence Dr. Linares identifies in support of his opinion is the May 15, 2009 bone scan and the July 21, 2010 sensory conduction study that were administered upon his referral.  (Tr. 692; *see* Tr. 353, 690-91).  As is relevant here, the bone scan indicated arthritic changes in both of Ausbrooks's knees, but was otherwise negative.  (Tr. 353; *see* Tr. 22 (ALJ's summary of this test)).  The sensory conduction study indicated "[l]umbosacral plexopathy without motor deficit" based upon mild to moderate (1 to 2 out of 5) findings, and revealed no findings suggesting irritation (Tr. 690); as the ALJ noted, this study "supports [Ausbrooks's] allegations of back pain, however, no diagnostic imaging tests confirm any degenerative process or compromised nerve roots that would require surgical intervention or more aggressive treatment."  (Tr. 22).  Thus, while these studies confirm the ALJ's assessment that Ausbrooks suffers from bilateral knee osteoarthritis and lumbar spondylosis and radiculopathy, they do not indicate, nor does Dr. Linares explain, why they lead to or support the extensive physical limitations set forth in his Questionnaire.  *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion.").  Ausbrooks likewise does not identify, and the Court does find, any other

tests or studies in the record that would support these limitations.

Nor can support for Dr. Linares's opinion be found in his treatment notes. To the contrary, as the ALJ observed, these notes reflect only "sporadic" visits to Dr. Linares—namely, three visits from May through June 2009, and two visits in June through July 2010—for Ausbrooks's complaints of back and knee pain (Tr. 354-59, 362, 686-89), which speaks both to the severity of these conditions and to the weight that Dr. Linares's assessment of them may merit. *See* 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). During these visits, Dr. Linares diagnosed Ausbrooks with lumbar spondylosis and radiculopathy, and treated these conditions with medication. (*See* Tr. 22 (ALJ summary of Dr. Linares's treatment notes)). This conservative course of treatment is consistent with that which Ausbrooks received from her other treating sources. (*See* Tr. 21-22 (ALJ noting that "[o]ther than [bladder suspension] surgery, doctors [at Mercy Memorial Hospital] have treated [Ausbrooks's] impairments only with medication," and that her treatment notes from Monroe Medical Associates "do not indicate any specific work restrictions or aggressive treatment other than medication"); *see also* Tr. 262-76, 315-52, 408-16, 419-550, 668-85 (treatment notes from these sources)). The ALJ properly considered this course of treatment in discounting Dr. Linares's opinion. *See, e.g.*, *Seay v. Comm'r of Soc. Sec.*, No. 11-12252, 2012 WL 3759027, at *6 (E.D. Mich. Aug. 6, 2012) (ALJ properly considered claimant's conservative courses of treatment in evaluating weight to afford treating sources' opinions).

Furthermore, as the ALJ noted, neither the objective medical evidence nor Dr. Linares's treatment notes provide any indication that Ausbrooks must have her legs elevated to hip level

100% of the time while performing a sedentary job[5], or that she can only reach, perform fine
manipulations with her fingers, and grasp, twist, and turn objects during 10% of the workday
each, as Dr. Linares opined (*see* Tr. 694-95). Ausbrooks contends that the leg elevation "is
justified by [her] back condition" [10 at 16], but points to nothing in Dr. Linares's notes or the
record requiring that postural restriction. As to her hand limitations, Ausbrooks asserts that she
complained of pain in her hands during visits with Dr. Linares [10 at 16]; indeed, during her
visits on May 29 and June 15, 2009, Ausbrooks reported that she could grip, flex and extend her
arm and elbow with some difficulty (Tr. 356, 359), but at no point in these visits or any others
does Dr. Linares offer any evaluation, diagnosis, or treatment of such complaints.[6] Furthermore,
as the ALJ noted, the remainder of the record likewise fails to substantiate Dr. Linares's hand-
use limitation. (*See* Tr. 19 (ALJ noting that although Ausbrooks "alleged arthritis in her hand,"
"there is no evidence to support this allegation"). Ausbrooks argues that Dr. Alviar observed
decreased left handgrip during his September 2009 examination of her [10 at 16 (citing Tr. 372)];
Dr. Alviar, however, also found no clubbing or cyanosis and otherwise intact digital dexterity,
and concluded that Ausbrooks "should be able to push, pull and carry more than 10 pounds
reasonably." (Tr. 371-72). It is not apparent how these findings, or Ausbrooks's complaints of
"some difficulty" gripping, would require that Ausbrooks's hand use be limited to 10% of a

---

[5] Ausbrooks contends that the ALJ "misconstrue[d]" this limitation as if Doctor Linares was
imposing a 24-hour-a-day limitation. Whereas Dr. Linares imposed the leg elevation restriction
for "100%" of "an 8 hour working day," the ALJ wrote that "[Dr. Linares] stated that
[Ausbrooks] should have her legs elevated to the level of her hips 100% of the day." (Tr. 23).
However, the context surrounding the ALJ's statement makes clear that she properly understood
Dr. Linares' limitation to cover only "an eight hour workday." (*Id.*). Indeed, the entire
paragraph was about the physical residual functional capacity that Dr. Linares provided for
Ausbrooks, in which he concluded that she was "incapable of even low stress jobs…" Thus,
Ausbrooks' argument that the ALJ misconstrued Dr. Linares' limitation lacks merit.

[6] Ausbrooks contends that Dr. Linares "found pain in both hands." [10 at 16 (citing Tr. 692)].
However, the page Ausbrooks cites is from Dr. Linares's Questionnaire, not from any treatment
record, and it simply reflects Dr. Linares's note that Ausbrooks complained of pain in her hands.

workday.

Ausbrooks argues more generally that Dr. Alviar's opinion supports that of Dr. Linares and that, since each would direct a finding of disability, they are uncontradicted and entitled to deference.  [10 at 16, 17; 24 at 1-2].  As indicated above, however, and as discussed more fully below, Dr. Alviar did not impose the same degree of limitations on Ausbrooks as Dr. Linares did, and this Court's review of Dr. Alviar's examination of Ausbrooks (Tr. 371) does not reveal any objective evidence that undermines the ALJ's assessment of Dr. Linares's opinion (or, for that matter, of Dr. Alviar's).  The fact that Dr. Linares and Dr. Alviar each offered an opinion which, if adopted, may direct a finding of disability, does not excuse either opinion from review against the medical record as a whole or dictate that the ALJ reach the same conclusion.  *See* 20 C.F.R. § 404.1527(c)(2)-(4), (d)(1), (d)(3).

Lastly, Ausbrooks notes that Dr. Linares is a pain specialist.  [10 at 17].  While a treating source's specialization is relevant to the weight afforded to his opinion, *see* 20 C.F.R. § 404.1527(c)(5), it is but one of many factors to be considered.  The Court finds that the ALJ's assessment of Dr. Linares's opinion reflects due consideration of all relevant factors, and is supported by substantial evidence.

### b.  Dr. Polavarapu

As to Dr. Polavarapu, the ALJ summarized his August 27, 2010 Psychiatric Evaluation Form for Affective Disorders and concluded that the opinion expressed therein was entitled to "very little weight" because it was "inconsistent with the record" and because the Form which he completed, "which is not a Social Security form[7], is highly suggestive" in that it "does not give

---

[7] The Commissioner notes that the form Dr. Polavarapu used "is very different than the form that Social Security uses in rating the severity of a claimant's mental impairments (see Form SSA-2506-BK at Tr. 396)."  [20 at 18].  Having compared the two forms, the Court agrees.

the physician the option to select mild to moderate limitations in the different areas of functioning and only provides the ability to select marked or extreme limitations" such that "if a physician finds any limitation even a mild one, he would be compelled to check it even though it may not be marked or extreme," and "Dr. Polavarapu may not have a clear understanding of the definitions of moderate, marked, and extreme limitations as they pertain to the Regulations." (Tr. 24).  Accordingly, the ALJ incorporated into her RFC assessment the limitations expressed by Dr. Polavarapu in this Form "to the degree that the medical evidence supports them."  (*Id.*)

The Court finds this assessment satisfies the requirements of the treating physician rule, and is supported by substantial evidence.  Ausbrooks contends that the ALJ failed to give "good reasons" for the weight she assigned Dr. Polavarapu's opinion and improperly "substituted her opinion for that of a physician."  [10 at 20].  The Court disagrees.  Rather than relying upon her own opinion of Ausbrooks's mental impairments, the ALJ simply weighed the evidence of record and fashioned an RFC regarding those impairments accordingly; the inconsistency of Dr. Polavarapu's opinion with the record alone certainly constitutes a sufficiently "good reason" for discounting the opinion in that analysis.  *See* 20 C.F.R. § 404.1527(c)(2)-(4).

Ausbrooks disputes that finding of inconsistency, asking "where are the psychiatric treatment records that contradict" Dr. Polavarapu's opinion?  [10 at 19].  As the ALJ noted, however, "[t]hroughout [her] treatment at Mercy Memorial Hospital [Ausbrooks] was assessed with GAF scores ranging from 50-60" which are "consistent with the ability to work."  (Tr. 23). Indeed, Dr. Polavarapu's treatment notes during the relevant time period reflect GAF assessments of 65-70.  (Tr. 584-86).  These notes also indicate effective control of Ausbrooks's symptoms with medication and a partial to full remission of her bipolar disorder.  (Tr. 631-33). *See also e.g.*, Tr. 660 (July 2009 note that Ausbrooks's "[m]ood is very well stabilized on the

Seroquel and her affect is bright" while on Seroquel); 587 (August 2009 note that Ausbrooks "was able to restart [Seroquel with] excellent symptom remission!"); 661 (August 2009 note that Ausbrooks's "mood is improved using the coupon for" Seroquel and she is "doing well in all areas")).

Relatedly, Ausbrooks also challenges the ALJ's characterization of the form completed by Dr. Polavarapu (Tr. 23-24), noting that, though it only provided check boxes for marked or extreme limitations, it also provided areas where moderate limitations could be written in, and furthermore, if a limitation were mild or moderate, the physician could simply not check a box and/or explain the limitation in writing. [10 at 19-20 (citing 700-01)]. Ausbrooks also notes that the Form contains definitions of slight, moderate, marked, and extreme impairments, thereby apprising Dr. Polavarapu of their meaning. [24 at 2 (citing Tr. 699-700)]. These points are well taken, but the Court agrees with the Commissioner that the Form's emphasis on findings of marked or extreme limitations is needlessly "suggestive" and may lead to inaccuracy in responses, notwithstanding a brief description of the meaning of those terms. The inconsistency of Dr. Polavarapu's opinion with the record indicates as much, and provides ample support for the ALJ's conclusion. Moreover, the ALJ's decision makes clear that her issues with the form used by Dr. Polavarapu were but one of numerous factors which led to the ultimate weight given to that doctor's opinions. (Tr. 24).

In sum, while Ausbrooks clearly has experienced difficulties as a result of her bipolar disorder and anxiety, this Court fails to find, and Ausbrooks fails to identify, any particular support in Dr. Polavarapu's treatment notes, or elsewhere in the medical record, for the breadth and severity of functional limitations indicated in Dr. Polavarapu's opinion. Moreover, under well-settled Sixth Circuit law, if the ALJ's decision is supported by substantial evidence, "it must

27

be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Cutlip*, 25 F.3d 284 at 286.  Here, the Court, for the reasons discussed above, finds that the ALJ's decision is supported by substantial evidence.  Accordingly, this Court must affirm that decision.[8]

> 2.  *The ALJ Did Not Err in Her Assessment of the Opinions of Consulting and Non-Examining Sources Dr. Alviar, Dr. Boneff, and Dr. Csokasey*

Ausbrooks also challenges the ALJ's assessments of the opinions of consulting and non-examining sources Dr. Alviar, Dr. Boneff, and Dr. Csokasey.  [10 at 17-19, 20-22].  As set forth below, the court sees no merit in these challenges, and finds that substantial evidence supports the ALJ's assessments.

> a.  *Dr. Alviar*

As to Dr. Alviar, the ALJ summarized his observations and findings from his September 2009 physical examination of Ausbrooks and concluded that his opinion is entitled to "some weight in regards to [Ausbrooks]'s abilities, yet his statement that [Ausbrooks] can only work a few hours is inconsistent with his own findings detailed above and inconsistent with the record as a whole."  (Tr. 22-23).

---

[8] Ausbrooks contends that the ALJ should have re-contacted Dr. Linares and Dr. Polavarapu to address any perceived ambiguity or inadequacy in their respective opinions.  [10 at 17, 20]. ALJs must re-contact a treating source regarding his or her opinion on the issue of disability when "the evidence does not support [that] opinion," and "the adjudicator cannot ascertain the basis of the opinion from the record."  *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 272 (6th Cir. 2010) (quoting SSR 96-5p).  This obligation is not triggered, however, when the opinion is "deemed unpersuasive not because its bases were unclear, but because they were not corroborated by objective medical evidence."  *Id.* at 275; *see also Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 n. 3 (6th Cir. 2009) ("[A]n ALJ is required to re-contact a treating physician only when the information received is inadequate to reach a determination on claimant's disability status, not where, as here, the ALJ rejects the limitations recommended by that physician.").  Here, the ALJ afforded little weight to the opinions of Drs. Linares and Polavarapu not because their bases were unclear to her, but because she found them unsupported by, and inconsistent with, the record.  The ALJ thus had no obligation to re-contact those treating sources.

As Ausbrooks recognizes [10 at 17], the ALJ's RFC assessment of Ausbrooks is consistent with the physical limitations set forth in Dr. Alviar's opinion, except for Dr. Alviar's statement that Ausbrooks "should be able to work a few hours in an 8 hour workday." (Tr. 371). Ausbrooks contends that the ALJ erred in concluding that this aspect of Dr. Alviar's opinion "is inconsistent with the doctor's own findings and the record as a whole," citing in support Dr. Linares's opinion, the sensory conduction study, Ausbrooks's rating of her pain as "8/10 at its worst," and Dr. Alviar's notes of "probable osteoarthritis of the spine" and "decreased handgrip on the left." [10 at 18]. None of this, however, substantiates Ausbrooks's claim of error. As discussed above, the ALJ properly concluded that Dr. Linares's opinion is not well supported and is inconsistent with the record, and the Court fails to see how the sensory conduction study or Dr. Alviar's findings regarding osteoarthritis of the spine and decreased handgrip indicate that Ausbrooks could only work—even under the significant restrictions set forth in the ALJ's RFC—for "a few hours" a day. Additionally, while Ausbrooks reported considerable back pain to Dr. Alviar, she also indicated that the pain decreased "to 4/10 after taking analgesics." (Tr. 370). Meanwhile, Dr. Alviar's examination of Ausbrooks revealed a normal gait with some limitations in walking; satisfactory range of motion in her upper extremities and limited range of motion in her back, knees, and left hip; a negative straight-leg-raising test; a limited ability to bend and squat, and limitations in climbing stairs, ropes and ladders; decreased handgrip on the left, otherwise intact digital dexterity, and no clubbing or cyanosis; and an ability to push, pull, and carry more than 10 pounds reasonably. (Tr. 371-72). The ALJ considered these findings, along with the objective medical evidence of record, and failed to find support for limiting Ausbrooks to "a few hours" per day of otherwise restricted work. (Tr. 21-24). The court sees no error in this analysis.

Citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240-41 (6th Cir. 2002), Ausbrooks contends that the ALJ's "selective inclusion of only portions of [Dr. Alviar's] report in formulating an RFC is error and lacks substantial evidence." [10 at 19].   Unlike *Howard*, however, there is no indication here that the ALJ, in evaluating Dr. Alviar's report and assessing Ausbrooks's RFC, "only considered part of [that] report."   *Id.* at 240.   *Howard* does not stand for the proposition that an ALJ errs by giving weight only to those aspects of an opinion he or she finds to be consistent with the record.   Ausbrooks also argues that Dr. Alviar "is entitled to special consideration" because he "regularly examines on behalf of SSA and is familiar with its programs and evidentiary requirements." [10 at 18].   Such familiarity is a relevant consideration in weighing a medical opinion, *see* 20 C.F.R. § 404.1527(c)(6), but so too are the opinion's supportability and consistency with the record, *id.* § 404.1527(c)(3)-(4).   Here, the ALJ's weighing of Dr. Alviar's opinion reflects a proper balance of all such relevant factors.   The Court thus rejects this claim of error.[9]

### b.  Dr. Boneff

As to Dr. Boneff, the ALJ summarized his September 2009 mental status examination of Ausbrooks, including his assessment of her with a GAF score of 55 and his opinion "that [Ausbrooks] should be able to do simple work related activities within the confines of her pain restrictions and that if she continue[s] to be compliant with her current medication and treatment she will do adequately."  (Tr. 22, 23; *see* Tr. 364-68).  The ALJ gave Dr. Boneff's opinion "great weight because it is consistent with the medical record as a whole and takes into consideration both the objective medical evidence and the claimant's subjective complaints."  (Tr. 23).

---

[9] As with Drs. Linares and Polavarapu, Ausbrooks again suggests that the ALJ should have re-contacted Dr. Alviar; for the same reasons set forth above, however, the Court sees no basis for any such obligation here.

Ausbrooks raises no colorable objection to this assessment.  First, she contends that "the inescapable conclusion is that the ALJ relies on the opinion of Dr. Boneff, a one-time examining psychologist, to assess not only claimant's psychiatric condition but also her physical condition," upon which he "is unqualified to comment."  [10 at 21].  This Court disagrees.  Dr. Boneff opined regarding the limitations posed by Ausbrooks's mental conditions, and qualified his opinion by recognizing that Ausbrooks's reported physical pain may also restrict her.  He did not offer, or even suggest, an opinion on the source, nature, or limiting effect of that pain, nor is there any indication that the ALJ looked to Dr. Boneff for such an opinion.

Second, Ausbrooks suggests that the ALJ erred by affording more weight to Dr. Boneff's opinion than to that of Dr. Polavarapu, asserting that "Dr. Boneff lacks the credentials of Dr. Polavarapu," and "[t]he opinion of a consulting physician is not entitled to the deference due to the opinion of a treating physician."  [10 at 21].  This argument also misses the mark.  As set forth above, the ALJ properly analyzed Dr. Polavarapu's opinion under the treating physician rule.  The ALJ did not purport to apply that deferential standard to Dr. Boneff's opinion, and her analysis is consistent with the applicable standards set forth in 20 C.F.R. § 404.1527(d)(3)-(6) which govern the weight given to medical source opinions, including those of non-treating physicians.  The Court thus sees no error.

### c.  Dr. Csokasey

As to Dr. Csokasey, the ALJ concluded that his October 2009 "mental assessment is given some weight because it is fairly consistent with the medical record as a whole" but that "the evidence received at the hearing level shows that [Ausbrooks] is slightly more limited than determined by" him and he "did not fully consider all [Ausbrooks]'s subjective complaints." (Tr. 24).

31

Ausbrooks raises a smattering of challenges to this assessment, none of which is persuasive. She asserts that Dr. Csokasey "[c]learly . . . is not a medical consultant" because his "area of expertise" is not identified in his assessment. [10 at 21]. Both on the assessment and in the record, however, he is plainly identified as a medical consultant holding a Ph.D. (Tr. 87, 386). Ausbrooks incorrectly asserts Dr. Csokasey did not sign his report; in fact, it is electronically signed. (Tr. 386, 402). And, Ausbrooks fails to explain how either circumstance constitutes reversible error. Ausbrooks also contends, as she did with Dr. Boneff, that Dr. Csokasey is unqualified to opine on her physical impairments. [10 at 22]. Here, however, Ausbrooks appears to be confusing Dr. Csokasey's *summary of Dr. Boneff's opinion* with an opinion of his own to that effect, which Dr. Csokasey did not offer (and which, as discussed above, was not an opinion on Ausbrooks's physical impairments in the first place). (Tr. 398).

More substantively, Ausbrooks contends that "the opinion of a non-examining physician is entitled to little weight if contrary to the opinion of a treating physician." [10 at 22 (citing *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987)]. While, as a general matter, "more weight [is given] to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not," 20 C.F.R. § 404.1527(c)(1), the ALJ "was not required to give relatively less weight to the agency source opinion[] simply because [it was] contrary to the opinion of [a treating source]." *Helm v. Comm'r of Soc. Sec. Admin.*, 405 F. App'x 997, 1002 (6th Cir. 2011). This is because the ALJ must, of course, also consider (among other factors) the supportability of each opinion, and its consistency with the medical records and other evidence. 20 C.F.R. 404.1527(d)(3), (4). Here, the ALJ gave weight to Dr. Csokasey's opinion to the extent she found it consistent with the record; the ALJ did not err simply because this weight proved to be greater than that afforded to Dr. Polavarapu's opinion when properly reviewed

32

under the treating physician rule. *See* SSR 96-6p, 1996 SSR LEXIS 3, *6 (noting that "the opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record" and that "[i]n appropriate circumstances, [such] opinions . . . may be entitled to greater weight than the opinions of treating or examining sources"); *Helm*, 405 F. App'x at 1002 (noting that "[o]nce the ALJ determined not to accord [the treating source] 'controlling weight,' the ALJ was required only to provide 'good reasons' for giving greater weight to the opinions of agency sources," and such "opinions need only be 'supported by evidence in the case record'" to potentially receive such greater weight).[10]

Ausbrooks also criticizes Dr. Csokasey's opinion for failing to include a review of Tr. 408-703. [10 at 22]. Much of what is contained in that portion of the record, however, either post-dates Dr. Csokasey's opinion or does not pertain to Ausbrooks's mental impairments; as for the rest, Ausbrooks does not identify, and the Court does not see, any treatment note or record that would undermine Dr. Csokasey's opinion or lead the ALJ to afford it even less weight. Furthermore, "[t]here is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record" to receive a weight greater than that of a treating physician, so long as it is supported by evidence in the case record. *Helm*, 405 F. App'x at 1002. Here, the ALJ credited only those aspects of Dr. Csokasey's opinion she found to be so supported, and the Court finds no error in this assessment.

---

[10] Ausbrooks's reliance on *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987) is misplaced. In *Shelman*, the Sixth Circuit "was concerned that the ALJ relied on the opinion of a medical expert in discounting the opinion of a treating physician." *Collins v. Comm'r of Soc. Sec.*, 357 F. App'x 663, 669 (6th Cir. 2009). Here, however, the ALJ did not rely on Dr. Csokasey's opinion in finding that Dr. Polavarapu's was entitled to "very little weight."

3.        *The ALJ Did Not Err in Her Assessment of Ausbrooks's Credibility*

Ausbrooks also challenges the ALJ's assessment of her credibility.  In general, the court is to accord an "ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [this Court does] not, of observing a witness's demeanor while testifying."  *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 476 (6th Cir. 2003).  The court's review of the ALJ's credibility assessment of Ausbrooks is thus "limited to evaluating whether or not the ALJ's explanations . . . are reasonable and supported by substantial evidence in the record."  *Id.*; *see also, e.g.*, *Fowler v. Comm'r of Soc. Sec.*, No. 11 -15161, 2012 WL 5050278, at *9 (E.D. Mich. Oct. 18, 2012) ("Generally, an ALJ's credibility assessment can be disturbed only for a 'compelling reason.'" (quoting *Sims v. Comm'r of Soc. Sec.,* 406 F. App'x 977, 981 (6th Cir. 2011))).

Here, the ALJ summarized Ausbrooks's testimony (Tr. 21) and concluded that her "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but her "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment." (Tr. 24).  In support, the ALJ explained that: (1) "[Ausbrooks's] allegations of severity of her impairments are not supported by the medical evidence"; (2) "[h]er allegations that she cannot work and cannot do any housework are inconsistent with her allegations that she watches her grandchild, helps her son with homework, helps cook, and can take care of all of her own personal needs"; (3) despite "alleg[ing] numerous problems with her sleep apnea," Ausbrooks "has not followed up with any treatment nor has she sought any additional testing" and this "failure to seek treatment suggests the impairment may not be as severe as alleged"; (4) Ausbrooks's assertion "that her anxiety and depression substantially limit[] her ability to work . .

34

. is contradicted by her testimony that her medication for her mental impairments is working";
and (5) while Ausbrooks's "previous work history was consistent up until she took a buyout
from Chrysler" and "such a work history might ordinarily lend to [her] allegations, any credit so
garnered is outweighed by the other factors addressed herein" and by the fact that Ausbrooks
"has not made many attempts to work at less demanding jobs." (*Id.*).

Ausbrooks objects to every aspect of this analysis, but the Court finds it reasonable and
supported by substantial evidence. First, Ausbrooks contends that "there is a plethora of
objective evidence to support [her] complaints as demonstrated by the record as a whole and the
ALJ's decision." [10 at 24]. Ausbrooks, however, does not elaborate further, and as indicated
by the analysis above, the Court finds substantial evidence in the record to support the ALJ's
assessment of Ausbrooks's complaints and RFC. Furthermore, even if substantial evidence were
to support Ausbrooks's characterization of her impairments and limitations, this would not, in
itself, be grounds for finding error in the ALJ's analysis. *See, e.g.*, *Jones*, 336 F.3d at 477
(rejecting challenge to credibility finding because, *inter alia*, "the Commissioner's decision
cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports
the claimant's position, so long as substantial evidence also supports the conclusion reached by
the ALJ" and "[i]n this case there was more than enough evidence to support the ALJ's
finding").

Ausbrooks also argues that the ALJ erred by "fail[ing] to review the seven factors of" 20
C.F.R. § 404.1529(c)(3) in her analysis. [10 at 25]. As Ausbrooks notes [10 at 24], an ALJ may
not reject a claimant's "statements about the intensity and persistence of [her] pain or other
symptoms or about the effect [her] symptoms have on [her] ability to work solely because the
available objective medical evidence does not substantiate [the claimant's] statements." 20

C.F.R. § 404.1529(c)(2). The regulations then provide a non-exhaustive list of other considerations that should inform an ALJ's credibility assessment. *See id.* § 404.1529(c)(3).[11] An ALJ, however, is not required to explicitly discuss every § 404.1529(c)(3) factor in that assessment, *see, e.g.*, *McCoy v. Comm'r of Soc. Sec.*, No. 09-11897, 2010 WL 3766473, at *6 (E.D. Mich. Sept. 21, 2010); rather, the ALJ's determination simply "must contain specific reasons for the finding on credibility, supported by the evidence in the case record," and be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." S.S.R. 96–7p, 1996 SSR LEXIS 4, *3-4.

The ALJ's analysis here meets that standard, and reflects due consideration of factors beyond the objective medical evidence, as contemplated by § 404.1529(c)—including Ausbrooks's daily activities, her complaints of pain and functional limitations, her courses of treatment, and her work history. (Tr. 21, 24). Ausbrooks contends this analysis is "inaccurate and selective" for a number of reasons [10 at 24-25]; amidst these disagreements with the ALJ's findings, however, the Court fails to see any deficiency amounting to error. For instance, while Ausbrooks contends that the daily activities identified by the ALJ are "not comparable to a work activity" [10 at 25], the ALJ never suggested they were; she simply found the activities inconsistent with the severity of impairments that Ausbrooks alleged—a proper consideration in her credibility assessment. *See, e.g.*, *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 532 (6th Cir.

---

[11] Namely, (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant received for relief of pain or other symptoms; (6) any measures the claimant used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

36

1997) ("An ALJ may . . . consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of pain or ailments.").  As to her sleep apnea, Ausbrooks points out that she "plausibly explain[ed]" that she did not fill her prescription for a CPAP machine in 2006 because she was "overwhelmed" with her other medications [10 at 25 (citing Tr. 53)]; plausible or not, however, this explanation did not require the ALJ to disregard Ausbrooks's failure to follow up on a prescribed course of treatment in assessing whether her sleep apnea was as severe as alleged during the relevant time period.  *See Gilbert v. Comm'r of Soc. Sec.*, No. 10-11331, 2011 WL 3840212, at *3 (E.D. Mich., Aug. 2, 2011) (considering claimant's failure to seek additional treatment in assessing severity of claimant's condition and pain); *see also* S.S.R. 96–7p ("[T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints . . . .").  Nor, as Ausbrooks suggests [10 at 25], does her testimony that her Seroquel "doesn't always work" (Tr. 46) undermine the ALJ's assessment of the effectiveness of her medication in controlling her mental impairments, particularly in light of the treatment notes (Tr. 631-33) to that effect and her testimony that the medication is "quite beneficial" (Tr. 45).  Lastly, Ausbrooks contends that "there was no discussion as to the side effects of her medications, the need to elevate her legs to waist level when she sits, and the need to lay down 3 or 4 times before lunch and twice in the afternoon," and also notes that "[a]fter her job at Chrysler, [she] unsuccessfully attempted work as a pool monitor and in a group home."  [10 at 25].  Although the ALJ could have addressed these issues in a more focused way, her decision does contain enough analysis to make clear that she considered these aspects of Ausbrooks's testimony, and the record, in making her assessment.  (*See* Tr. 18 (discussing Ausbrooks's work history); 21 (discussing Ausbrooks's testimony regarding side effects of medication and limitations in sitting and standing); *see also*

37

Tr. 23 (discussing lack of medical evidence supporting need for Ausbrooks's legs to be elevated 100% of the work day); 24 (noting Dr. Polavarapu's finding that Ausbrooks's "current medication has not caused any major negative side effects")).  Ausbrooks may not agree with how the ALJ chose to analyze the record and credit her testimony, but the Court finds her assessment to be reasonable and supported by substantial evidence.  The Court thus rejects this claim of error.

### 4.   The ALJ Did Not Err in Eliciting and Evaluating the VE's Testimony

Ausbrooks next contends that the ALJ erred in concluding that Ausbrooks can perform a significant number of jobs in the national economy because: (1) the ALJ's RFC contemplates that Ausbrooks would receive multiple bathroom breaks each day, but the ALJ's hypothetical to the VE provides for only one such break per day; (2) the RFC limits Ausbrooks to only occasional contact with the general public, coworkers, and supervisors, but the VE testified that work would be precluded where, for at least one third of the day (*i.e.*, occasionally), the hypothetical individual in question could not interact at all with or respond appropriately to co-workers and supervisors; and (3) the ALJ found that Ausbrooks suffers from moderate difficulties in concentration, persistence, and pace, but the ALJ's hypothetical to the VE did not incorporate such limitations.  [10 at 12-14].

The transcript of the VE's testimony belies Ausbrooks's first two claims of error.  First, the VE made clear that her testimony was premised upon a hypothetical individual who was permitted to take a bathroom break of five to six minutes per hour, not a single such break per day.  (Tr. 76-77).  Second, the VE testified that work would be precluded if the hypothetical individual in question was markedly to extremely limited in social functioning such that, for at least one third of the day, he or she could not interact at all with or respond appropriately to co-

38

workers and supervisors during that time. (Tr. 81-83). This, however, is not the relevant inquiry here. The ALJ found that Ausbrooks has "moderate difficulties in social functioning" (Tr. 19), and, as a result, is limited to occasional contact with the general public, coworkers, and supervisors. (Tr. 20). The ALJ presented the VE with a hypothetical individual possessing this limitation (and the others reflected in Ausbrooks's RFC), and the VE testified that he or she could perform other work. (Tr. 68-71). The VE's testimony regarding another individual with marked to extreme limitations in social functioning therefore does not undermine or contradict this conclusion.

Nor did the ALJ err in her treatment of Ausbrooks's limitations in concentration, persistence, or pace. At Step Two of her analysis, the ALJ concluded that Ausbrooks "has moderate difficulties in concentration, persistence or pace," explaining that Ausbrooks's "mental impairments and physical impairments both limit [her] ability to complete complex tasks." (Tr. 19). Then, the ALJ, in her RFC assessment, limited Ausbrooks to work at the SVP 1-2 level (Tr. 20) – which corresponds to unskilled work, *see* S.S.R. 00–4p[12], 2000 SSR LEXIS 8 – and incorporated that limitation into the hypothetical presented to the VE. (Tr. 68-69).

Ausbrooks contends that the ALJ's SVP 1-2 limitation fails to adequately reflect the extent of her "moderate difficulties" in concentration, persistence, and pace. The ALJ, however, found Ausbrooks to have such moderate difficulties due to her limited "ability to complete *complex* tasks." (Tr. 19) (emphasis added). This corresponds with Dr. Csokasey's conclusion that Ausbrooks was moderately limited in concentration, persistence, and pace, but still "able to perform simple/routine tasks on a sustained basis" (Tr. 398, 402), as well as Dr. Boneff's opinion

---

[12] "Unskilled work, by definition, is limited to understanding, remembering and carrying out only simple duties requiring little or no judgment." *Edmunds v. Comm'r of Soc. Sec.*, No. 09-13076, 2010 WL 3633768, at *7 (E.D. Mich. Aug. 17, 2010) (citing 20 C.F.R. § 404.1568(a)), *adopted by* 2010 WL 3633767 (E.D. Mich. Sept. 14, 2010).

that Ausbrooks "should be able to do simple work related activities within the confines of her pain restrictions" (Tr. 366). By limiting Ausbrooks to unskilled work, the ALJ accounted for and communicated to the VE these findings regarding Ausbrooks's particular difficulties in concentration, persistence, or pace; the Court sees no error in this regard. *See Johnson v. Comm'r of Soc. Sec.*, No. 12-11780, 2013 WL 1747805, at *6 (E.D. Mich. Feb. 1, 2013) ("[T]here is no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of 'unskilled, routine work' but excludes a moderate limitation in concentration. Rather, this Court must look at the record as a whole and determine if substantial evidence supports the ALJ's RFC."); *Lewicki v. Comm'r of Soc. Sec.*, No. 09–11844, 2010 WL 3905375, at *3 (E.D. Mich. Sept. 30, 2010) (finding that "[t]here may be cases where . . . moderate limitations [in concentration, persistence, or pace] preclude the performance of even some simple, unskilled tasks" but "Plaintiff does not . . . explain why the facts of this particular case require a more detailed hypothetical question to adequately account for his own moderate limitations," and noting that "the same state psychologist who diagnosed Plaintiff's mental limitations in the first place . . . also concluded that Plaintiff's mental limitations would not prohibit him from performing simple, unskilled work"); *see also, e.g.*, *Burnett v. Comm'r of Soc. Sec.*, No. 10-14739, 2012 WL 3870362, at *6-7 (E.D. Mich. Sept. 6, 2012); *Edmunds*, 2010 WL 3633768 at *7-8; *Hess v. Comm'r of Soc. Sec.*, No. 07–13138, 2008 WL 2478325, at *7-8 (E.D. Mich. June 16, 2008).[13]

---

[13] Ausbrooks's reliance on *Ealy v. Commissioner of Social Security,* 594 F.3d 504 (6th Cir. 2010), is misplaced. [10 at 13]. In *Ealy,* the Sixth Circuit rejected an ALJ's "streamlined hypothetical" which limited the claimant "to simple, repetitive tasks and instructions in non-public settings" but which did not include any "speed- and pace-based restrictions"; this omission was erroneous because the ALJ had found that the claimant's RFC limited his "ability to sustain attention to complete simple repetitive tasks to '[two-hour] segments over an eight-hour day where speed was not critical.'" *Id.* at 516. As set forth above, however, there was no

5.     *The ALJ Did Not Err in Failing to Consider the Effect of Ausbrooks's Impairments in Combination*

Ausbrooks next contends that the ALJ erred by failing to consider the combined effect of all of her impairments—severe and non-severe—in assessing her RFC.  [10 at 25-27].  In particular, Ausbrooks identifies the impairments that the ALJ found to be non-severe—her diabetes, obesity, right-shoulder impairment, and hand arthritis—and also "cardiac findings, gastrointestinal findings including colitis, restless leg syndrome and polynephritis."  [10 at 26 (citations omitted)].

The Court sees no merit in this contention.  First, Ausbrooks offers no explanation or record support for her suggestion that these conditions, alone or in combination with her other impairments, result in functional limitations beyond those accommodated by the ALJ's RFC.  Second, the ALJ's decision makes clear that she assessed what limitations, if any, these conditions may pose.  As to the non-severe impairments, the ALJ found that Ausbrooks's diabetes "is controlled as long as [Ausbrooks's] weight is controlled," and considered the medical records documenting this condition in her RFC assessment.  (Tr. 18, 21).  The ALJ found no evidence to support Ausbrooks's alleged arthritis in her hand, but considered Ausbrooks's testimony regarding limitations in using her hands as well as Dr. Alviar's finding regarding decreased grip in her left hand.  (Tr. 19, 21-23).  She also noted that the "assessed [RFC] can accommodate" Ausbrooks's right shoulder impairment "as it requires little weight lifting."  (Tr. 18-19).  Lastly, the ALJ found that Ausbrooks's obesity "has not been identified to cause any functional limitations," a finding which Ausbrooks fails to rebut with record evidence;

such oversight here; the ALJ's hypothetical duly captured her well-supported findings regarding Ausbrooks's limitations in concentration, persistence, or pace. *See, e.g.*, *Taylor v. Comm'r of Soc. Sec.*, No. 11-46, 2012 WL 1029299, at *10 (W.D. Mich. Mar. 26, 2012) (distinguishing *Ealy* on this basis).

she also noted Dr. Alviar's diagnosis of obesity, and as discussed above, adopted many of the limitations he recommended.   (Tr. 18, 22).   The ALJ thus duly considered the effect of Ausbrooks's obesity on her other impairments, as required under S.S.R. 02-1p.   *See, e.g.*, *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 442-43 (6th Cir. 2010) (ALJ duly considered impact of claimant's obesity by mentioning it in findings of fact and, in fashioning claimant's RFC, considering opinions of physicians who acknowledged his obesity); *Essary v. Comm'r of Soc. Sec.*, 114 F. App'x 662, 667 (6th Cir. 2004) (finding that, contrary to claimant's position, ALJ did take claimant's obesity into account in assessing her ability to work and that "[t]he absence of further elaboration on the issue of obesity likely stems from the fact that [claimant] failed to present evidence of any functional limitations resulting specifically from her obesity").

Similarly, the other conditions identified by Ausbrooks derive from various treatment notes from Mercy Memorial Hospital and Monroe Medical Associates, which the ALJ expressly considered in her RFC assessment.   (*See* Tr. 21 (noting that Ausbrooks "had multiple emergency room visits and follow-up appointments between 2004 and 2009" at Mercy Memorial Hospital, which included treatment for, *inter alia*, "acute inflammatory colitis" and "pyelonephritis," and making clear that "[t]he extensive evidence provided from Mercy Memorial Hospital was reviewed and all information was taken into consideration i[n] assessing the above residual functional capacity"); 21-22 (noting that, during her treatment at Monroe Medical Associates, Ausbrooks "has had normal evaluations, numerous tests, and was prescribed medication for her mental impairments and pain" and that "[t]he treatment notes record her continued problems with pain and mental impairments, but do not indicate any specific work restrictions or aggressive treatment other than medication").   Furthermore, as the ALJ noted, some of these

42

conditions lasted only a short duration (Tr. 21), and some also pre-dated her alleged period of disability (*see* Tr. 409 (note from March 2007 visit finding colitis and treating with medication); Tr. 414 (note from May 2005 visit finding pyelonephritis and treating with medication)). Ausbrooks fails to identify, and the Court does not see, anything in the record to indicate that the ALJ's consideration of these conditions was erroneous, or that any of these conditions produced functional limitations inconsistent with the ALJ's RFC.  The Court thus sees no basis for this claim of error.

> 6.     *The ALJ Did Not Err in Failing to Perform a Function-by-Function Assessment of Ausbrooks*

Ausbrooks also contends that the ALJ erred in her RFC assessment by failing to include a "function-by-function" analysis of her limitations, as required by S.S.R.96-8p.  [10 at 27].  In support, Ausbrooks asserts that "[t]here is no discussion of [her] capacity to walk, lift, carry, push, pull and understand and remember."  [10 at 28].

"Although a function-by-function analysis is desirable, S.S.R. 96–8p does not require ALJs to produce such a detailed statement in writing. . . . [T]he ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record." *Delgado v. Comm'r of Soc. Sec.,* 30 F. App'x 542, at 547-548 (6th Cir. 2002) (citations and quotation marks omitted); *see also, e.g.*, *Knox v. Astrue,* 327 F. App'x 652, 657–58 (7th Cir. 2009) ("Although the 'RFC assessment is a function-by-function assessment,' S.S.R. 96–8p, the expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient."); *Tobey v. Comm'r of Soc. Sec.*, No. 11-15069, 2013 WL 1010727, at *11 (E.D. Mich. Feb. 22, 2013), *adopted by* 2013 WL 1016736 (E.D. Mich. Mar. 14, 2013) (finding that the"[t]he ALJ . . .

sufficiently articulated his residual functional capacity finding under S.S.R. 96–8p" because he "discussed the medical and other evidence on the disputed issues and his narrative discussion adequately explained the basis of plaintiff s RFC").

Here, as set forth above, the ALJ provided a thorough discussion of the basis for her RFC assessment of Ausbrooks, including the nature of Ausbrooks's impairments and consequent functional limitations, and how she analyzed the evidence of record in making that assessment. Furthermore, this assessment clearly reflects consideration of Ausbrooks' "capacity to walk, lift, carry, push, pull and understand and remember" [10 at 28], as it restricts Ausbrooks to work that is unskilled (which, as noted above, "is limited to understanding, remembering and carrying out only simple duties requiring little or no judgment," *Edmunds*, 2010 WL 3633768 at *7) and sedentary (which "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools" and in which "a certain amount of walking and standing is often necessary in carrying out job duties," 20 C.F.R. § 404.1567(a)). Ausbrooks does not explain, and the Court does not see, how any fuller discussion of these limitations would have affected the ALJ's RFC assessment. Accordingly, the Court rejects this claim of error.

### 7.  *Ausbrooks's Remaining Claims of Error Lack Merit*

Ausbrooks raises two final claims of error, neither of which is meritorious. First, she claims that the ALJ erroneously admitted into evidence the report of a single decision maker. [11 at 28-29]. While that report is present in the record (Tr. 378-85), at no point does the ALJ cite to it or otherwise indicate any reliance upon it. Moreover, at the hearing, Ausbrooks's counsel raised this issue; he and the ALJ discussed that "because [the report is] by a [single decision maker]" the issue was not the weight to give the report, but rather, its "admissibility."

(Tr. 36).   The ALJ responded, "Yes I'm [] aware of that."   (*Id.*).   Together this shows that Ausbrooks was not prejudiced by the report's presence in the record, and the Court sees no substance to this claim.   Likewise, Ausbrooks claims that "[t]he ALJ's failure to follow statute, case law, regulation and ruling has prejudiced [her] and deprived her of substantial rights mandating reversal."   [11 at 28].   Ausbrooks does not identify any particular failure in connection with this claim and, as set forth above, the Court finds that the ALJ did not err in any other respect.   Accordingly, this claim of error is also rejected.

The Court thus finds no error in the ALJ's determination, and finds instead that substantial evidence supports that determination.   Therefore, Ausbrooks's Motion for Summary Judgment shall be denied.

### G.      Ausbrooks's Motion for Sentence-Six Remand

As noted above, in addition to her Motion for Summary Judgment, Ausbrooks moves for remand to consider new evidence under sentence six of 42 U.S.C. § 405(g).  [11].   According to Ausbrooks, the following evidence, which she previously submitted to the Appeals Council, warrants such remand: (1) treatment notes and records documenting four visits to Endocrine Specialists, PC in March through May of 2011 regarding monitoring and treatment of her diabetes; (2) treatment notes from Mercy Memorial Hospital regarding the insertion of a right uretral stent on January 20, 2011; (3) test results and notes from Dr. Linares regarding a bone scan administered January 17, 2011; and (4) various notes and records dating from January 18, 2005, through June 22, 2011, regarding the treatment of her mental impairments at The Family Center of Mercy Memorial Hospital.

Remand to consider new evidence is appropriate only when the evidence is material, and good cause is shown as to why it was not presented at the prior proceeding.  42 U.S.C. § 405(g);

*Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (6th Cir. 1984).  New evidence is "material" if there is "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence."  *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 712 (6th Cir. 1988).  "Good cause" requires the claimant to demonstrate "a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ."  *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2002).

The additional evidence offered by Ausbrooks falls short of this standard.  First, Ausbrooks concedes that the notes regarding the treatment of her mental impairments were, at least in part, available at the time of the ALJ's decision, and she does not offer any "good cause" for failing to acquire and present them to the ALJ.  Second, the Court does not find a reasonable probability that any of this evidence would, if considered, lead the ALJ to reach a different disposition of Ausbrooks's claim of disability.  Namely, the Court does not see, and Ausbrooks does not explain, how the treatment Ausbrooks received for her diabetes in the spring of 2011, or the insertion of a uretral stent in January 2011, is incompatible with the ALJ's assessment of the severity and functional limitations posed by her diabetes and incontinence during the relevant time period.  Similarly, Ausbrooks's treatment notes from The Family Center are substantially consistent with those already in the record before the ALJ and reveal nothing that would be likely to alter the ALJ's assessment of her mental impairments; Ausbrooks again offers no explanation to the contrary.

As to the January 2011 bone scan, Ausbrooks notes that it revealed an uptake of tracer in the lumbar spine, which she suggests is contrary to the ALJ's finding that "[n]o diagnostic tests confirm any degenerative process in [her] back."  [11 at 1-2].  The ALJ's finding, however, was

that "no diagnostic imaging tests confirm any degenerative process or compromised nerve roots that would require surgical intervention or more aggressive treatment."  (Tr. 22).  There is no indication in Ausbrooks's proffered evidence that this uptake in tracer in the lumbar spine reveals a "degenerative process . . . that would require surgical intervention or more aggressive treatment," or a degree of impairment incompatible with the restricted sedentary work set forth in the ALJ's RFC assessment.[14]   Accordingly, the Court sees no basis to remand Ausbrooks's claim under sentence six of 42 U.S.C. § 405(g), and it will therefore deny her Motion for Remand.

## III.    CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Ausbrooks's Motions for Summary Judgment **[10]** and for Remand **[11]** are **DENIED**, the Commissioner's Motion for Summary Judgment **[20]** is **GRANTED**, and this case is **AFFIRMED**.


Dated: July 5, 2013                                        s/David R. Grand
Ann Arbor, Michigan                                   DAVID R. GRAND
                                                              United States Magistrate Judge


### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 5, 2013.

                                                              s/Felicia M. Moses
                                                              FELICIA M. MOSES
                                                              Case Manager

---

[14] In fact, Dr. Linares's notes from the same day of that bone scan indicate that Ausbrooks's "pain control" was "adequate," and reflect continued treatment with medication.  [11-5 at 11].